UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE THE APPLICATION OF<br><br>DENISE FINK,<br><br>    Petitioner,<br><br>v.<br><br>HAROLD LAVERN WALKER, HAROLD WALKER, SR., and PAM WALKER<br><br>    Respondents. | Case No. 06-cv-807-JPG |

**MEMORANDUM AND ORDER**

On October 19, 2006, Denise Fink (Fink) filed a petition for return of child and motion for issuance of a warrant in lieu of a writ of habeas corpus pursuant to The Convention on the Civil Aspects of International Abduction, done at the Hague on October 25, 1980 (the Convention) and the International Child Abduction Remedies Act (the Act), 42 U.S.C. § 11601 *et seq.* (Docs. 2, 3). The Court held a hearing on Fink's motion on October 26, 2006, and issued a warrant pursuant to her request. United States Marshals executed the warrant that day and brought Fink's son, Aron James Brent Fink (Aron), before this Court. The Court held another hearing that afternoon, a hearing the next day and a final hearing on October 31. At the conclusion of the hearing on October 31, the Court granted Fink's petition for return of child and allowed Fink to take Aron back to Germany, the country of his birth.[1] The Court now states its reasons.

**ANALYSIS**

---

[1] The United States and Germany are signatories to the Convention. *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).

1

I.      **The Convention**

   A.      **General Provisions**

The purpose of the Convention is to implement an effective deterrent to the practice of parental kidnapping. *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995). Its approach to the problem is straightforward; "[i]t is designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child and protect the legal custody rights of the non-abducting parent." *Id*. Principally, it mandates the return of the child "to his or her circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting state has violated the custody rights of the other." *Id*. The Convention deprives an abduction of any jurisdictional consequences because its signatories agree to send a child wrongfully removed to the place of removal without making any determinations on the underlying custody of the child. *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

To succeed on a petition under the Convention, a petitioner must establish by a preponderance of the evidence that the respondent "wrongfully removed or retained" a child within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). The removal or retention of a child is wrongful where: "(a) it is in breach of custody rights attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention those rights were actually exercised . . . or would have been exercised but for the removal or retention." *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed.Reg. 10494, 10505 (1986); *Koch*, 450 F.3d at 712.

The Third Circuit has stated the following working definition of habitual residence: "the place where [the child] has been physically present for an amount of time sufficient for

acclimatization and which has a degree of settled purpose from the child's perspective." *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004); *see also Koch*, 450 F.3d at 715-19.[2]

Once the petitioner meets her initial burden, the burden shifts to the respondent (assuming he wishes to keep the child) to show "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies" or "by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies." 42 U.S.C. § 11603(e)(2)(A), (B).[3]

### B. Extraordinary Measures: Removal of a Child from Respondent without Notice

Pursuant to 42 U.S.C. § 11604(a), a court having jurisdiction under the Act "may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of

---

[2] When the child is too young to determine the issue of residence himself, a court's inquiry should focus on the intentions of "the person or persons entitled to fix the place of the child's residence." *Whiting*, 391 F.3d at 548. Factors important to this consideration include "the conduct and the overtly stated intentions and agreements of the parents during the period preceding" the abduction. *Id*. at 549.

[3] In *Fabri v. Pritikin-Fabri*, 221 F.Supp.2d 859, 863 (N.D. Ill. 2001), the court offered this summary of the affirmative defenses under the Convention:
> Four exceptions to the reach of the Convention are set forth in Articles 12, 13, and 20. The responding parent bears the burden of proving that one of these exceptions applies. For two of the exceptions, the burden is one of "clear and convincing evidence." Specifically, the responding parent may avoid an order returning the child if she can demonstrate by clear and convincing evidence (1) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Art. 13(b), or (2) that returning the child would be inconsistent with "fundamental principles . . . relating to the protection of human rights and fundamental freedoms." The other two exceptions are subject to proof by a preponderance of the evidence. These include a showing (3) that judicial proceedings were not commenced within one year of the child's abduction, and she is now well-settled in her new home, Art. 12, or (4) that the petitioning parent was not actually exercising custody rights at the time of the child's removal.

(citations omitted).

the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." A court cannot order a child removed from the person having physical control of the child unless it does so in accordance with state law. *Id*. at § 11604(b).

### i. Illinois Law

Under 750 ILCS 36/311(a), "[u]pon the filing of a petition seeking enforcement of a child-custody determination, the petitioner may file a verified application for the issuance of a warrant to take physical custody of the child if the child is immediately likely to suffer serious physical harm or be removed from this State." If, after hearing testimony from the petitioner, a court is satisfied that the child is "imminently likely to . . . be removed from this State, [that court] may issue a warrant to take physical custody of the child." *Id*. at 36/311(b). In such cases, "the petition must be heard on the next judicial day after the warrant is *executed* unless that date is impossible. In that event, the court shall hold the hearing on the first judicial day possible." *Id*. (emphasis added).[4] The respondent must also be served with the petition, warrant and order immediately after the child is taken into physical custody. *Id*. at 36/311(d).[5]

---

[4] The warrant must: "(1) recite the facts upon which a conclusion of imminent serious physical harm or removal from the jurisdiction is based; (2) direct law enforcement officers to take physical custody of the child immediately; and (3) provide for the placement of the child pending final relief." *Id*. at 36/311(c).

[5] 750 ILCS 36/311(e) provides as follows:
> A warrant to take physical custody of a child is enforceable throughout this State. If the court finds on the basis of the testimony of the petitioner or other witness that a less intrusive remedy is not effective, it may authorize law enforcement officers to enter private property to take physical custody of the child. If required by exigent circumstances of the case, the court may authorize law enforcement officers to make a forcible entry at any hour.

The Court is also free to "impose conditions upon placement of a child to ensure the appearance of the child and the child's custodian." *Id*. at 36/311(f).

### ii.     *McCullough v. McCullough*

In *McCullough v. McCullough*, 4 F.Supp.2d 411, 413 (W.D. Pa. 1998), petitioner's wife absconded with her children from their home in Canada to the United States; she told her husband that she and the children would not be returning because the "end time" was near. Respondent was a member of the Philadelphia Church of God, whose members were then in the process of traveling to Petra, Jordan – the only place they felt that God would save them from the impending apocalypse. Petitioner asked the court to issue a warrant directing law enforcement personnel to remove his children from his wife's custody without notice.

Based on petitioner's testimony, taken *ex parte*, the court found extraordinary relief under § 11604 warranted. *Id*. at 415. It held that state law (the court sat in Pennsylvania) provided a mechanism for removing a child from a parent's custody without notice in similar circumstances. The Court analogized the request for an *ex parte* warrant pursuant to Pennsylvania law to a request for a temporary restraining order and looked to Federal Rule of Civil Procedure 65 "[f]or procedural guidance." *Id*. Finding the requirements of § 11604, state law and Rule 65(b) satisfied, it issued a warrant directing the Marshals Service to remove the children from their mother's custody and to bring the children and their mother before it that day. *Id*. at 412-13. After interviewing the children and satisfying itself that the children would be safe with their father,[6] the court remanded the children to the custody of their father pending an evidentiary hearing the next day. *Id*. at 416. The court eventually granted the mother a short continuance of the evidentiary hearing to allow her to obtain counsel. *Id*.

### iii.     Standard for the Issuance of a TRO without Notice under Fed.R.Civ.P.

---

[6] The court asked the mother whether she had any concerns about the children's safety and she said that she did not. *McCullough*, 4 F.Supp.2d at 416.

65

A court may enter an *ex parte* TRO if the applicant shows "that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition," and special reasons why notice should be excused. Fed.R.Civ.P. 65(b); *Levas & Levas v. Village of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982). *Ex parte* TROs, if issued, should last only as long as is necessary to hold a hearing and no longer. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 438-39 (1974); *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984).

Aside from the above, the standard for granting an *ex parte* TRO is the same as that for a preliminary injunction. *See generally* 13 JAMES WM. MOOR ET AL., MOORE'S FEDERAL PRACTICE § 65.36[1]. To obtain a preliminary injunction, the movant must show that (1) she has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) she will suffer irreparable harm if the court does not grant the injunction. *Goodman v. Ill. Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). If the movant satisfies these three requirements, a court considers the irreparable harm the nonmoving party will suffer if it grants the injunction, balancing the harm against the irreparable harm the moving party will suffer if it does not. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). It must also consider the public interest in denying or granting the injunction. *Id*. at 896. In the end, a court weighs these factors under a "sliding scale approach," under which, "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id*. at 895.

II.   The Court's Hearing on Fink's Request for Issuance of a Warrant

    A.   The Hearing

At the *ex parte* hearing, Fink gave credible testimony as to the following. Aron was born

out of wedlock to Fink and Harold Lavern Walker (Walker), in Germany, on August 10, 2001. The three of them lived together in Kaiserslautern, Germany until August 2002, when Fink and Aron moved to Giessen, Germany. While the family lived together, the couple often fought. Sometimes, the fights would become violent and at least on one occasion, Walker hit Fink in the face, drawing blood. Fink moved to Giessen after Walker strangled her and threatened to kill her.[7] From that point, Aron lived exclusively with Fink in Giessen.

On October 21, 2005, Walker picked Aron up from school (in Giessen), with Fink's consent. Walker told Fink he would return Aron by 6:00 p.m. the following day – unbeknownst to Fink, Walker had previously taken Aron's passport and other identification. Walker picked up Aron from school, and immediately took Aron with him to the United States without Fink's consent. Once in the United States, Walker let Aron speak with his mother just a few times and never told her where he and Aron were. Through the authorities in Germany, Fink obtained the help of the International Center for Missing and Exploited Children, who, in conjunction with several federal agencies and the St. Clair County Illinois Sheriff's Department, found Aron residing at 859 Wilshire Drive, Belleville, Illinois 62223.

Fink's counsel directed the Court to § 1626 of the German Civil Code, which provides:

> (1) if the parents are not married to each other at the time of the birth of the child, they may exercise parental custody jointly provided that they 1) declare that they wish to exercise custody jointly (declarations of custody), or 2) enter into marriage with each other.
>
> (2) Otherwise the mother has parental custody rights.

Fink then testified that she and Walker never made the declarations mentioned in this statute. In

---

[7] When Walker testified before the Court, he denied or partially denied Fink's assertions regarding his allegedly violent behavior. Based on its observations of Walker, the Court found him to be a credible witness.

support of these assertions, counsel directed the Court to a letter from a magistrate or municipal authority at a German youth welfare office (which he attached to the complaint) indicating that no declarations of custody were on file for Aron.

### B. The Court's Findings

Given Walker's abduction of Aron and his subsequent elusion of both Fink and the authorities, the Court judged Walker a sufficient flight risk to warrant relief under § 11604. Further, it deemed 750 ILCS 36/311 to cover a situation sufficiently analogous to that before it, that an *ex parte* warrant could potentially issue under its terms. Following the direction of *McCullough*, the Court looked to Rule 65 for procedural guidance, and amalgamated the requirements for the issuance of an *ex parte* TRO under the Rule with the requirements of both § 36/311 and § 11604.

Fink's testimony and the evidence presented by counsel met the facial requirements of both § 11604 and § 36/311 and the threshold requirement for the issuance of an *ex parte* TRO – irreparable harm should the respondent receive notice. Walker's flight risk was also, of course, sufficient to convince the Court on the irreparable injury and adequate remedy at law requirements. Fink also convinced the Court that she was very likely to succeed on the merits of her petition. She testified that she and Walker never married, she gave birth to Aron in Germany, he lived there his entire life and he lived exclusively with her for the three years prior to his abduction. The Court took judicial notice of § 1626 of the German Civil Code, *see Mozes*, 239 F.3d at 1084, and counsel presented a decree from the German government indicating that Fink had sole custody rights of Aron. She testified that she was exercising her custody rights when Walker took Aron to the United States and that he did so without her permission. Based on this testimony and the evidence presented by counsel, the Court felt it very likely that Fink would establish Aron's habitual residence

as Germany, that she was exercising custody rights over Aron when Walker took him, that Walker's taking of Aron, without her permission, was in breach of those rights and that he was unlikely to be able to establish any defenses under the Convention. After balancing Fink's, Walker's and the public's interests, the Court determined that the balance favored Fink. Accordingly, it issued the warrant ordering the Marshals to bring Aron before it immediately.[8] It also ordered the Marshals to serve Walker with the warrant, the petition and the other documents filed in this case and set a hearing for the next day. See 750 ILCS 36/311.

### III. Subsequent Hearings

The Marshals found Aron at school and brought him before the Court on October 26, 2006. The Court immediately interviewed Aron *in camera*. That day, it became clear that Aron was then living with Walker's father and stepmother, Harold Walker, Sr., and Pam Walker. The Marshals contacted Walker Sr. and informed him of the events of the day. Walker Sr. came before the Court, and it held another hearing that afternoon. Walker Sr. explained that Aron was living with he and his wife and that Walker was then working in Kuwait and had been there for several months. In light of Walker Sr.'s information, the Court granted Fink's motion to amend her petition to substitute Walker Sr. and Pam Walker as defendants and to change her theory to wrongful retention. The Court then informed Walker Sr. that it had set the matter for a hearing for the next morning. It told him, however, that it would be amenable to a continuance if he could not obtain counsel before that time. Finally, it asked Walker Sr. whether he would be concerned about Aron's safety if the Court were to remand Aron to his mother's custody pending resolution of this case. He said that he did not think Aron would be in any danger.

---

[8] The Court ordered Fink to post $500.00 bond and to surrender her passport to her attorney. It also forbade Fink from removing Aron from Illinois or Missouri.

9

Walker Sr. was unable to obtain counsel for the hearing on October 27, so, in light of that fact, the Court granted his request for a continuance until the following Tuesday, October 31.[9] Walker Sr. informed the Court that he had contacted his son and that he (Walker) would be present for the hearing the following Tuesday. After an additional, *in camera* conversation with Aron, the Court remanded him to the custody of his mother pending the next hearing.

## IV.     Final Determination

Walker appeared at the October 31 hearing, with counsel. In light of his appearance, the Court granted Fink's motion to amend her petition once again; her amended petition named Walker, Walker Sr. and Pam Walker as defendants. Counsel, through argument and his questioning of Walker, attempted to establish Walker's taking of Aron as justified. In large part, he relied on absence of an official custody determination in Germany at the time of the abduction. Walker also recounted numerous discussions with Fink about whether it would be in Aron's best interest – in terms of his ability to follow a course of study of his own choosing and eventually attend college – to grow up in the United States. Walker felt that Aron might not be able to the get the same education in Germany given the nature of its higher education system. Walker also wanted to play an active role in Aron's life and, because he was unable to get a good job in Germany, thought it would be better if the family lived in the United States.

Walker related several instances of dishonest conduct on the part of Fink, respecting her receipt of welfare benefits in Germany, among other things. He also testified that when he took Aron from Germany, he looked malnourished and had numerous warts on his arms. Walker detailed

---

[9] While aware that it gave Walker a short period of time in which to defend this case, the Court found that the circumstances of the case warranted a swift hearing – important among them was the fact that Fink had very limited resources.

a number of other parental deficiencies on the part of Fink as well, including her failure to look after his education.

The Court found most if not all of Walker's testimony credible.[10] Nevertheless, on the stand, he essentially admitted all the elements necessary for Fink to succeed on her petition. He admitted he had no parental or custodial rights at the time of the abduction and that Fink was exercising custody rights over Aron at the time of the abduction. He testified that he did not tell Fink (and thereby failed to get her permission) that he was going to take Aron to the United States. Moreover, he admitted that he attempted to lie low when he got back to the States, because he "didn't want anyone else to be involved in the situation." (10/31/06 Tr. 31). He did not dispute that Aron's habitual residence was Germany.

After hearing all the testimony, the Court found that Fink met her burden and that Walker failed to introduce sufficient evidence to merit the application of any of the affirmative defenses in the convention – Fink filed the petition within a year of the abduction, there was insufficient evidence that Fink acquiesced to the removal, and little evidence that returning Aron to his mother and Germany posed a grave risk or threat. As Walker's removal was wrongful, so too was Walker Sr. and Pam Walker's retention of Aron. *See Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (noting that wrongful retention is "the act of keeping the child without the consent of the person who was actually exercising custody."). Therefore, the Court granted Fink's petition and

---

[10] The Court had the opportunity to observe Walker during the hearing. He convinced the Court of his good character and of his fitness as a father. The Court stated the following:
> The Court is convinced Mr. Walker, that you are a very loving and caring father. . . . [T]he Court firmly believes that in your mind . . . you did [what] you felt was in the best interest of Aron, but what you did was not right. And even though your heart may have been in the right place, you went . . . about it the wrong way.

(10/31 Tr. 49).

gave Fink leave to return to Germany, with Aron, that day.

Subsequently, the parties submitted a consent order, under which Walker agreed to pay Fink's court costs, litigation costs and travel costs in this matter in consideration for Fink and her attorney's withdrawal of their request for the attorney's fees accrued in this case.

## CONCLUSION

By issuing its order directing the return of Aron to Germany (Doc. 20), the Court granted Fink's petition. Accordingly, this case is closed.

**IT IS SO ORDERED.**

**DATED: January 10, 2007.**

            **s/ J. Phil Gilbert**
            **J. PHIL GILBERT**
            **U.S. District Judge**